**Rebecca Ann FRASER, Plaintiff,**

v.

**UNITED STATES BANCORP, a federally insured banking corporation; et al., Defendants.**

**No. CIV. 00–543–JO.**

United States District Court,
D. Oregon.

Sept. 28, 2001.

---

Craig Alan Crispin, Crispin and Associates, Portland, OR, Attorney for Plaintiff.

Jeffrey J. Druckman, Tamara E. Russell, Druckman & Associates, Portland, OR, Attorney for Defendants.

Michelle Renee Burrows, Kohler and Burrows, Portland, OR, Robert Thuemmel, Thuemmel & Uhle, Portland, OR, Attorneys for Counter–Defendant Rebecca Ann Fraser.

## OPINION AND ORDER

JONES, District Judge.

Plaintiff Rebecca Ann Fraser brings three claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and one claim under the parallel state statute, ORS 659.436, against her former employer, defendant U.S. Bank National Association ("the bank"), and a common law claim for intentional infliction of emotional distress against the bank and three individual defendants.

Defendants now move for summary judgment on all claims (# 35). In response to the motion, plaintiff agreed to withdraw her claim for intentional infliction of emotional distress. That claim and all individual defendants are, therefore, dismissed.

The remainder of the bank's motion is narrowly focused on one essential element of plaintiff's ADA claims: whether she is "disabled" within the meaning of the ADA. Specifically, the question framed by the pleadings is whether during the relevant time, plaintiff had an impairment that "substantially limit[ed] a major life activity." For the reasons explained below, I conclude that plaintiff has failed to demonstrate the existence of a genuine issue of material fact as to whether she was disabled as defined. Consequently, the remainder of the bank's motion is granted.

## STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of America v. Phelps Dodge,* 865 F.2d 1539, 1542 (9th Cir.1989).

The substantive law governing a claim determines whether a fact is material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party. *T.W. Elec. Service,* 809 F.2d at 631. Inferences drawn from facts are viewed in the light most favorable to the non-moving party. *Id.* at 630–31.

## FACTUAL BACKGROUND

Because the present motion addresses only the issue of disability, the parties have not explained the factual background giving rise to plaintiff's claims in any detail. The First Amended Complaint ("Complaint") alleges the following. Plaintiff alleges that she began employment for the bank on June 29, 1998, in the position of Senior Account Specialist for Fastline banking. At that time she informed her employer that she was diabetic. Shortly thereafter, she was promoted to Senior Account Specialist.

On November 16, 1998, plaintiff was informed by her supervisor, Jeff Erwin, that she could not eat at her desk. At 7:30 p.m.[1] that day plaintiff recorded her blood sugar as "dangerously low 46 * * *." A

---

1. Plaintiff evidently worked a late shift.

few minutes later, her blood sugar dropped to 34. She wanted to eat some cookies at her desk, but first sought clarification from Erwin because of his "admonition." Complaint, ¶ 13. Plaintiff approached Erwin, explained the problem, and asked to eat at her desk. Erwin "declined to speak with her about her situation and told her to return to work." Plaintiff became disoriented, forgot how to leave the building, again asked Erwin for permission to eat something, he "responded negatively," and eventually plaintiff "went home and passed out." Complaint, ¶ 14.

Plaintiff filed a complaint with Erwin's supervisor, Joe Ledbetter. On November 18, 1998, Ledbetter asked plaintiff to meet with him, "indicat[ing] that he was investigating [her] complaint," but made her sit in his waiting area for seven hours. Plaintiff alleges that she is "unaware of any discipline which was given to Mr. Erwin." Complaint, ¶ 15.

Plaintiff alleges that from November 20, 1998, through March 3, 1999, she was subjected to retaliation for filing her complaint "including harassment, a change of assignment, a change of workstation and increased scrutiny." Complaint, ¶ 16 (listing various actions).

In January 1999, plaintiff asked for and was approved to take a leave of absence to install an insulin pump. Plaintiff alleges that she called in on each day of her absence, as required. According to plaintiff, "[d]espite the prearrangement and the written acceptance of the disability leave, on or about March 12, 1999, Plaintiff was terminated * * * while she was in the Diabetic Institute having her insulin pump installed." Complaint, ¶¶ 17, 18.

## DISCUSSION

### 1. *Legal Framework*

None of the above factual background is directly at issue in the present motion.

Instead, the motion is limited to the issue of whether plaintiff's diabetes qualifies as a "disability" under the ADA and parallel state law. The ADA protects only those individuals whose impairments "substantially limit" a major life activity. 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.2(g)(1). "Substantially limits," as defined by the regulations, means the individual either is:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). "Major life activities" mean "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

■ In 1999, the United States Supreme Court clarified that "the determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment * * *." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). That ruling rejected the EEOC's "Interpretive Guidance," which stated that " '[t]he determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices.' " *Sutton,* 527 U.S. at 480, 119 S.Ct. 2139 (*quoting* 29 C.F.R. Pt. 163, App. § 1630.2(j)(1998))(superceded to reflect the *Sutton* ruling). In rejecting the EEOC's definition of disability, the Supreme Court noted that

The agency guidelines' directive that persons be judged in their uncorrected or unmitigated state runs directly counter to the individualized inquiry mandated by the ADA. The agency approach would often require courts and employers to speculate about a person's condition and would, in many cases, force them to make a disability determination based on general information about how an uncorrected impairment usually affects individuals, rather than on the individual's actual condition. *For instance, under this view, courts would almost certainly find all diabetics to be disabled, because if they failed to monitor their blood sugar levels and administer insulin, they would almost certainly be substantially limited in one or more major life activities. A diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes.* Thus, the guidelines approach would create a system in which persons often must be treated as members of a group of people with similar impairments, rather than as individuals. This is contrary to both the letter and the spirit of the ADA.

*Sutton,* 527 U.S. at 483–84, 119 S.Ct. 2139 (emphasis added).

■ Thus, disabilities must be evaluated " 'with respect to an individual' " and "is an individualized inquiry." *Sutton,* 527 U.S. at 483, 119 S.Ct. 2139 (*quoting Bragdon v. Abbott,* 524 U.S. 624, 641–42, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)).

2. *Facts Relevant to Present Motion*

The parties mostly agree on the following facts. Plaintiff is a Type 1 (juvenile onset or insulin dependent) diabetic. Her diabetes is "uncomplicated," that is, so far she shows no risk of developing long-term complications such as blindness, vascular cardiac disease, or kidney failure. Defen-

dants' Memorandum, Deposition of Darrell Lockwood, M.D. ("Lockwood depo"), pp. 13–14. On the other hand, plaintiff is what some call a "brittle diabetic" (although her doctor, Dr. Lockwood does not "personally use that term," Lockwood depo, p. 9), that is, her blood glucose level tends to swing high and low fairly rapidly. In 1992, plaintiff suffered a diabetic coma and since then, has been rated permanently partially disabled by the Social Security Administration and receives benefits.

It appears from the evidence, in particular Dr. Lockwood's testimony and chart notes, that historically, plaintiff has had significant difficulty controlling her blood glucose levels, at least in part because at times she failed to follow his advice and drank alcohol, did not exercise, did not monitor her blood glucose as instructed, and did not use insulin as instructed. The parties both rely on the following testimony from Dr. Lockwood concerning the effect of plaintiff's diabetes:

Q. (by defense counsel): Now, if Ms. Fraser had taken the steps that you outlined to me to have a regular diet, proper insulin injections, and proper monitoring of her blood glucose levels, would she have been substantially limited in any of the following major life activities:

Caring for herself?

A. No.

Q. Performing manual tasks?

A. Well, only to the extent, and this would probably apply to most of those things, it would have to do potentially. Depends on the-on the duration of the activity, for example. In other words, you and I could skip a meal. You know, the normal person might have a job—

\* \* \* \* \* \*

A. I'm saying there might be a limit. Potentially, there might be a manual activity or there might be a requirement, let's say, to be in a meeting or whatever you're talking about, that takes you beyond the point where, you know, you need to test yourself or you need to—or you need to take your shot or you need to eat.

On the other hand, if she was in a situation where she had to do a physical activity, you know, significantly more than she was used to, then that would affect her. Or conversely, if she were kept from doing—because of one occupation kept from doing the normal amount of physical activity, that would affect her.

So that, you know, we sort of differentiate it down. *Could she do virtually any manual task that any other person like her could do? For now, sure. She at this point in her life is not limited for that.* But could she do it for, you know, for six hours? Probably not. See what I'm saying? She can do it—

Q. She can walk.

A. Yeah, she can walk.

Q. Can she see?

A. She can see.

Q. Can she hear?

A. She can hear.

Q. Can she speak?

A. She can speak.

Q. And can she learn?

A. She can learn. Now, learning and speaking and seeing at least all can be affected if the sugars are high or low.

Q. But if her blood glucose is properly controlled.

A. If it's normal at this point, she can do all those things. But what I'm saying is doing those things could potentially affect her ability to keep that sugar normal. So there is this interaction.

You know, it might be analogous to ask whether a nursing mother could do all of those things. A nursing mother could do all of those things, but not without an interruption once in a while.

Q. Would you consider a nursing mother to be disabled?

A. No, but she's limited. She's going to have to deal with the reality of her situation. And I think that's-The diabetic is, in her case, she's limited *not by the complication of diabetes, but by the requirements of—of the condition itself, just to maintain. So if she can't take a break to eat, can't take a break to get her shot, can't take a break to test herself, that's a potential problem.*

Lockwood depo, pp. 51–54 (emphasis added).

In March 1999, plaintiff had an insulin pump installed. She testified that, with the pump, she can lead a normal life except that she cannot get the pump wet, for example, she must remove the pump to water ski. She states that she can consume what she wants, when she wants, and can consume alcohol. She can work, and has worked full time since she left the bank. According to plaintiff, as long as her blood glucose level is under control and she is not having a bad day, "I don't have a tremendous amount of limitations" and "there really are no limitations on what [I] can do." Deposition of Rebecca Fraser ("Fraser depo"), pp. 47–48. In the year after receiving the insulin pump up through the deposition, plaintiff experienced at most only two bad days. *Id.* at p. 48.

### 3. The Parties' Arguments

The bank summarizes its argument in favor of summary judgment as follows:

> Fraser has, over a period of several years, been irresponsible in taking the routine steps that are necessary to deal with her diabetes. As long as she takes these measures, she should have no problems. Her diabetes is uncomplicated. She can lead a perfectly normal, active, healthy life by following the regimen of regular monitoring, diet, and exercise.

Defendants' Memorandum, p. 10. The bank continues:

> Fraser's condition should be examined in its corrected state. Under this analysis, she is not a disabled person for two reasons. First, for many . years, she failed to take corrective measures that would very easily have controlled her diabetes. Her failure to do so is her responsibility and her fault. Had she taken these simple measures, there is no dispute that she would not have been substantially limited in any major life activity. She cannot bootstrap herself into coverage under the ADA by acting irresponsibly and failing to take the measures that any similarly situated prudent person would. * * *
>
> Second, Fraser is not ˙disabled˙ because she has admitted that, with the installation of her insulin pump, she is perfectly able to function without any limitation. * * *

Defendants' Memorandum, p. 23. The bank further contends that even in her unmitigated state and disregarding plaintiff's poor self-care, she cannot show and has not shown that her diabetes substantially limited any major life activity.

▆ In response, plaintiff first contends that her condition with the insulin pump after March 1999, when she was terminated, is irrelevant. I agree with plaintiff on this point. If the insulin pump is relevant at all, it would show only that her diabetes could have been better controlled by use of the pump. Evidence concerning the insulin pump does not establish, however, the extent to which her diabetes was controllable during her short tenure with the bank, at least up through the last few days of employment. *See, e.g., Cash v. Smith,* 231 F.3d 1301, 1306 n. 5 (11th Cir.2000)(the employment action complained of occurred in late April and early May of 1998, "and we evaluate her disability as manifested at that time"); *Gray v. Sears, Roebuck & Co.,* 131 F.Supp.2d 895, 903 (S.D.Tex.2001)(evidence of substantial limitations caused by plaintiff's diabetes irrelevant as "disability must be evaluated as it existed at the time of the alleged adverse employment decision").

Second, plaintiff argues that the bank has "misappropriat[ed]" the *Sutton* holding. According to plaintiff, when the Supreme Court said that mitigating measures must be taken . into account in judging whether an individual with an impairment is disabled, the Court did not intend the impairment to be evaluated in some hypothetical controllable state; rather, the Court intended the impairment to be evaluated "in light of the actual (but not hypothetical) controlling measures employed by plaintiff and her physicians." Plaintiff's Opposition, p. 7. Plaintiff thus argues that the impact of her diabetes in July 1998 through March 1999, the period of her employment, must be considered in light of the actual corrective measures in place at that time, which did not include an insulin pump.

Based on the above, plaintiff makes two arguments. First, she asserts that the bank has failed to establish that she "acted in any way voluntarily to avoid reasonable mitigating treatments or medications." Plaintiff's Opposition, p. 9 (footnote omitted). Instead, according to plaintiff, the

evidence shows that she monitored her blood glucose level a minimum of four times per day, that her bad eating habits in part resulted from possible diabetic gastroparesis, and that she never skipped an insulin injection. Plaintiff states that she has been "pretty good" about checking her glucose levels, and has never been openly resistant to Dr. Lockwood's medical advice. *See generally* Plaintiff's Opposition, pp. 9–10.

Second, plaintiff contends that during the relevant time, her diabetes had a substantial effect on major life activities:

> [D]uring the fall of 1998, plaintiff experienced frequent fluctuations in her blood sugar levels exacerbated by stress on the job, requiring intervention by her treating physician and others. On several occasions, plaintiff was unable to wake up in the morning because her blood sugar had fallen during the night. * * * The substantial limitations on [plaintiff's] ability to eat, speak, think, and reason were starkly evident on November 16, 1998 when she was not allowed to finish her lunch at her desk and suffered a severe episode of low blood sugar. * * * When [plaintiff's] blood sugar dropped, she went into hypoglycemia, which directly affected her ability to think, walk, talk, and communicate.

Plaintiff's Opposition, pp. 10–11 (citations omitted).

*4. Analysis*

■■■ The parties each cite cases from other jurisdictions in which courts either did or did not find sufficient evidence that a person with diabetes or some other treatable condition was "disabled" within the meaning of the ADA. I have reviewed those cases, but the point remains that the inquiry must be an individualized one: Diabetes, while no doubt an impairment, is not a *per se* disability but may render certain individuals disabled, depending on the facts.

In this case, the bank's motion rests on the theory that plaintiff's own behavior caused her diabetes to be out of control, and that if controlled, her diabetes would not affect any major life activity as evidenced by her condition after installation of the insulin pump. The bank also has presented evidence, in the form of plaintiff's doctor's testimony and her own, that mitigated or unmitigated, her diabetes caused no *actual substantial* limitation, only a *potential* limitation, on a major life activity.

In response to the bank's motion, plaintiff offers generalities and speculation concerning how she *might have been affected* if her blood glucose level was not well-controlled, but has failed to produce specific, admissible evidence that she was, in fact, substantially limited during the relevant period of time. While it appears from the evidence that diabetes has an adverse effect on plaintiff, no evidence demonstrates or even suggests that diabetes substantially limited her ability to care for herself, perform manual tasks, walk, see, talk, breathe, learn, work, or engage in similar activities.

■■■ Plaintiff also proposes that the effect of diabetes on her endocrine system function and ability to metabolize food qualifies as a substantial limitation on a "major life activity." In the absence of a statute, administrative rule, or Ninth Circuit precedent supporting such a theory, I decline to accept that in crafting the language of the ADA, Congress intended the functioning of a person's internal bodily systems, without more, to qualify as a "major life activity."

Because the bank has demonstrated the absence of a genuine issue of material fact, plaintiff was required to come forward with specific, admissible evidence sufficient to create a triable issue of fact as to whether she was disabled during the rele-

vant time, a critical element of her prima facie case. Plaintiff has failed to do so. The bank is, therefore, entitled to summary judgment on plaintiff's disability discrimination claims.

## CONCLUSION

Defendants' motion for summary judgment (# 35) is GRANTED with respect to plaintiff's ADA and state law disability discrimination claims and those claims are dismissed. Based on plaintiff's withdrawal of her claim for intentional infliction of emotional distress, that claim is dismissed and the portion of defendant's motion addressing that claim is MOOT. Any other pending motions are denied as moot and this action is dismissed with prejudice.