**Juanita A. BUGG–BARBER, Plaintiff,**

v.

**RANDSTAD US, L.P., Defendant.**

**No. CIV.A.01–2470 RMC.**

United States District Court, District of Columbia.

May 20, 2003.

Woodley Beal Osborne, Jr., Osborne & Deutsch, Washington, DC, for plaintiff.

Juanita A. Bugg-Barber, Washington, DC, pro se.

Charles Anthony Zdebski, Jennifer A. Kerkhoff, Troutman Sanders, LLP, Washington, DC, Benjamin D. Vriggs, Troutman Sanders LLP, Atlanta, GA, for defendant.

### MEMORANDUM OPINION

COLLYER, District Judge.

Juanita A. Bugg-Barber has sued her former employer, Randstad US, L.P. ("Randstad"), alleging that her discharge on January 2, 2001, violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Human Rights Act of the District of Columbia, D.C. CODE § 2–1402.11 ("DCHRA"). At the close of discovery, Randstad filed a motion for summary judgment, which is opposed by Ms. Bugg-Barber. After careful review of the parties' submissions, deposition testimony, and supporting evidence, the Court concludes that Randstad is entitled to summary judgment.

### I. BACKGROUND [1]

Randstad, Ms. Bugg-Barber's employer from July 2000 to January 2001, provides temporary staff to various companies, such as the Pension Benefit Guarantee Corporation ("PBGC"). The PBGC is a federal agency that manages pension fund assets of bankrupt and near-bankrupt companies to ensure employee pension benefits. Ms. Bugg-Barber worked as a Customer Service Representative ("CSR") at the PBGC's call center in Washington, D.C., answering calls and providing information on benefit inquiries from covered employees. CSRs work in small cubicles surrounded by fellow CSRs who are engaged in telephone conversations with outsiders. Ms. Bugg-Barber's employment was subject to a Randstad Employee Handbook, which required employees to "control voice level and avoid arguing with coworkers and associates" and to maintain "[c]ourtesy and professionalism" at all times. Randstad St. ¶ 11. Randstad reserved the right to impose "immediate dismissal" for "misconduct or major offenses." *Id.* ¶¶ 10, 11.

Ms. Bugg-Barber is a Type 1 Insulin Dependent Diabetic, whose pancreas does

---

1. The facts are taken predominately from Randstad's Statement of Material Facts About Which There Is No Genuine Issue for Trial ("Randstad Statement"). Ms. Bugg-Barber filed a Statement of Genuine Issues and Response to Defendant's Statement of Material Facts ("Bugg-Barber Statement"), which accepted most of the Randstad Statement and otherwise simply (i) denied those facts from the Randstad Statement with which Ms. Bugg-Barber disagrees, or (ii) cited legal authority for her differing view of the facts. The Court notes that a response to a properly-presented motion for summary judgment must "include references to the part of the record relied on to support the statement" that genuine issues of material fact are contested. LCvR 7.1(h); *see Waterhouse v. District of Columbia*, 124 F.Supp.2d 1, 4 (D.D.C. 2000), *aff'd*, 298 F.3d 989 (D.C.Cir.2002). Argument and legal conclusions are not evidence.

not produce insulin. She is also considered a "brittle" diabetic, one whose condition is more erratic and difficult to control. She must monitor her blood sugar levels at least four times a day, administer injections of insulin, and respond to variations in her blood sugar levels with glucose tablets, food, orange juice and rest. Her doctor testified in deposition that it requires "a substantial effort to attempt to control the blood sugar" in patients like Ms. Bugg–Barber who, "despite their best effort, ... are unable to control" their sugar level fluctuations. Pinzone Dep. at 218.

As a result of her diabetes, high levels of sugar in Ms. Bugg–Barber's blood, or hyperglycemia, can produce blurred vision, serious dehydration, irritability, mood swings, and impaired thinking. Low blood sugar, or hypoglycemia, can produce anxiety, difficulty in focusing, difficulty in concentrating, acute hunger, difficulty standing, irritability and mood swings. *See* Pinzone Dep. at 223–228. The exact nature of the impact of these conditions on Ms. Bugg–Barber's daily life is described in various ways.[2] Ms. Bugg–Barber asserts that she suffers from these symptoms regularly, sometimes on a daily basis. Prior to filing suit, she submitted a sworn affidavit to the Equal Employment Opportunity Commission ("EEOC") stating that she experiences "severe problems" when she "do[es] not take [her] insulin regularly." Pl. Dep. at 71 (quoting Pl. Aff.). Dr. Joseph Pinzone, her treating physician and expert witness, testified that the debilitating effects of her diabetes are "intermittent" and "[o]n an average day, she, like others with a similar prob-

lem, are [*sic*] able to generally function." Pinzone Dep. at 230.

Throughout her employment with Randstad, Ms. Bugg–Barber reported to Valerie Palmer and was directly supervised by Carolyn Wheeler. Ms. Palmer knew that Ms. Bugg–Barber had diabetes, that she had gone to the PBGC nurse on one occasion to check her blood sugar, that she was contemplating getting an insulin pump, and that a "sick note" from September 2000 mentioned diabetes. Ms. Wheeler had at least one conversation with Ms. Bugg–Barber in which Ms. Wheeler learned that Ms. Bugg–Barber was considering insulin pump therapy. However, Ms. Wheeler recalled no conversations about how Ms. Bugg–Barber's diabetes affected her. Ms. Bugg–Barber testified that she once told her supervisors where they could find her glucose tablets and that they should give her two or three if she did not appear well. She also recalled describing things that had happened to her in previous jobs, including instances where she became disoriented or irritable, and that she sometimes became confrontational. Ms. Bugg–Barber asserts that she once provided a document concerning hyper- and hypoglycemia symptoms to her supervisors.

The immediate events leading to Ms. Bugg–Barber's discharge are not materially in dispute. Ms. Bugg–Barber has admitted most of the facts contained in the Randstad Statement. Those matters over which there are disputes are noted but, as discussed below, do not affect the legal conclusions.

At approximately 4:00 p.m. on December 29, 2000, Carolyn Wheeler observed Ms.

---

**2.** Ms. Bugg–Barber attached affidavits from Chanel Barber, Gregory Anthony Barber, and Larry Gorban to support her testimony that her diabetes affects her daily life. However, none of these witnesses was properly disclosed during discovery or mentioned at all until after Randstad had filed its motion for summary judgment. The Court strikes these affidavits from the record and gives them no weight.

Bugg–Barber standing next to the desk of a new trainee, Chrishelle Bertrand. Ms. Wheeler approached Ms. Bugg–Barber and, as she routinely does to keep the call center operating efficiently, asked, "what are you working on[?]" Randstad St. ¶ 17 (quoting Wheeler Dep. at 53). Ms. Bugg–Barber responded that she was "working on a record." *Id.* (quoting Wheeler Dep. at 53). Ms. Wheeler was skeptical about this response because Ms. Bugg–Barber was standing next to the cubical of a new, inexperienced employee who Ms. Wheeler believed could not have been assisting Ms. Bugg–Barber with a record. Ms. Wheeler instructed Ms. Bugg–Barber that she needed to return to her desk and get on the telephone because they had "calls in queue." *Id.* ¶ 19 (quoting Wheeler Dep. at 58).

In response to Ms. Wheeler's inquiry and request, Ms. Bugg–Barber became confrontational and disruptive.[3] Ms. Bugg–Barber repeatedly told Ms. Wheeler that Ms. Wheeler was "bothering her" and demanded that Ms. Wheeler "leave her alone." *Id.* ¶ 21 (quoting Wheeler Dep. at 60–61). Ms. Bugg–Barber stepped back to her own work cubicle, remained standing, and told Ms. Wheeler "to leave her alone because her blood sugar was up." Bugg–Barber St. ¶ 21 (quoting Wheeler Dep. at 61). Ms. Wheeler asked Ms. Bugg–Barber to speak with her in private, but Ms.

Bugg–Barber did not comply and only continued to mutter that Ms. Wheeler should stop "bothering" her. Randstad St. ¶¶ 23–24 (quoting Wheeler Dep. at 60); *see* Bugg–Barber St. ¶¶ 23–24.

Supervisor Palmer and Assistant Supervisor Brian Johnson heard something of this exchange and came over to see what was happening.[4] Both of them observed Ms. Bugg–Barber pointing her finger in Ms. Wheeler's face and threatening to show Ms. Wheeler a "side of me that you don't want to see." Randstad St. ¶ 27 (quoting Palmer Dep. at 35–36). Mr. Johnson's written memorandum reported that Ms. Bugg–Barber was "yelling at the top of her voice" for Ms. Wheeler to "get out of my face" and also stated that she was "sick and tired of the supervisors." *Id.* ¶ 28 (quoting Blessing Dep. Ex. A). Ms. Palmer asked Ms. Wheeler to leave Ms. Bugg–Barber's desk, which she did.

Ms. Palmer then asked Ms. Bugg–Barber to see her before Ms. Bugg–Barber left for the day. Ms. Bugg–Barber responded by telling Ms. Palmer to leave her alone. When Ms. Palmer repeated her direction to see her before she left for the day, Ms. Bugg–Barber responded, "whatever." Randstad St. ¶ 31 (quoting Palmer Dep. at 37). Ms. Bugg–Barber cannot remember the details of this encounter and does not deny that she told Ms. Palmer to

---

3. The parties dispute the degree to which Ms. Bugg–Barber became loud in this exchange. Ms. Wheeler reported that "[h]er voice was raised beyond a normal conversation between two people." Wheeler Dep. at 59. Ms. Palmer described Ms. Bugg–Barber's behavior as "rude, hostile, what I perceived to be threatening . . . ." Palmer Dep. at 43. Ms. Bugg–Barber denies that she created a "commotion." Bugg–Barber St. ¶ 26.

4. Ms. Bugg–Barber asserts that the attachment to the affidavit submitted by Randstad from Mr. Johnson is inadmissible because he did not show up for his deposition. *See* Pl.

Opp. at 12 n. 8. Randstad responds that Mr. Johnson was properly listed by it as a potential witness, but that he had left its employment by the time of his deposition and that counsel for Ms. Bugg–Barber abandoned his pursuit of the deposition when he realized that he would need to subpoena the witness rather than merely notice the deposition. Randstad also argues that Mr. Johnson's memorandum was prepared in the normal course of business and is authenticated by others present. Because this is a contemporaneous and authentic business record, the Court accepts Mr. Johnson's memorandum.

leave her alone, although she also testified in deposition that she remembers telling Ms. Palmer that it was not a good time due to her condition. *See* Bugg–Barber St. ¶ 31; Randstad St. ¶ 33. Ms. Bugg–Barber left without seeing Ms. Palmer at the end of the day. When Ms. Bugg–Barber next reported to work on January 2, 2001, she did not discuss or explain her conduct from the preceding Friday with either Mses. Wheeler or Palmer.

On Tuesday, January 2, 2001, Ms. Palmer reported to Contract Manager Gwynne Anne Hadidian, who was filling in for Mary Beth Blessing, the Contract Manager on the PBGC contract, about the events that had taken place the preceding Friday. Ms. Palmer told Ms. Hadidian that Ms. Bugg–Barber had become rude, hostile, insubordinate and threatening toward Ms. Wheeler and that, when Ms. Palmer intervened, Ms. Bugg–Barber had treated her in the same manner. Ms. Palmer also informed Ms. Hadidian that Ms. Bugg–Barber had refused and failed to discuss the events in Ms. Palmer's office on December 29, 2000, despite two instructions to meet with her before she left for the day. Ms. Hadidian then talked with Ms. Blessing by telephone and they decided to terminate Ms. Bugg–Barber for misconduct. This discipline was admittedly consistent with a prior termination in the summer of 2002.

Ms. Hadidian asked Ms. Palmer to send Ms. Bugg–Barber to the Randstad Office away from the PBGC to be informed of her termination. When Ms. Bugg–Barber arrived, Ms. Hadidian told Ms. Bugg–Barber that she was being terminated for misconduct and showed her the Handbook provisions that applied.[5] Ms. Bugg–Barber became agitated and told Ms. Hadidian that Randstad would have to physically remove her from the call center. Ms.

Hadidian told Ms. Bugg–Barber to remain in her office until she calmed down but Ms. Bugg–Barber left the office in a "tirade." Randstad St. ¶ 44 (quoting Hadidian Dep. at 53).

Ms. Bugg–Barber returned to the call center, where she confronted Ms. Palmer and told her, "[I]f I see you in Union Station, I'm going to kick your ass." *Id.* ¶ 46 (quoting Palmer Dep. at 49–50). During this exchange, Ms. Bugg–Barber yelled obscenities that were heard by others in the call center. Ms. Palmer was "upset and felt very threatened" by this encounter, stating that Ms. Bugg–Barber "looked like a wild woman in the way she rushed into [Ms. Palmer's] office, the language she was using." *Id.* ¶ 49 (quoting Palmer Dep. at 51–52). With the assistance of building security, the situation was defused and Ms. Bugg–Barber collected her things and left. In her brief, Ms. Bugg–Barber states that she became sick to her stomach in the garage outside the call center and was taken by a friend to the hospital on January 2, where she spent nine days recovering from a blood sugar imbalance. The PBGC, Randstad's client, was very upset that the incident happened in its offices. It expressed its concern that Randstad had allowed Ms. Bugg–Barber back into the call center when it knew how upset she was and that security had needed to be called.

Ms. Bugg–Barber acknowledges that no one ever told her she was terminated for any reason other than her misconduct. She testified that she was never denied a request for an accommodation (a statement her counsel denies is material, *see* Bugg–Barber St. ¶ 84). She admits that she was permitted to go to the PBGC nurse for blood sugar testing when needed and to take time off from work without

---

5. Ms. Bugg–Barber denies the materiality of anything that happened after Mses. Hadidian and Blessing decided to terminate Ms. Bugg–Barber but does not dispute any of these facts.

adverse consequences due to diabetes-related illness. No one from Randstad prevented her from checking her blood sugar, injecting insulin, taking glucose tablets, eating snacks or drinking juice at her desk. Ms. Bugg–Barber filed a discrimination charge with the EEOC, alleging that she was "unjustifiably discharged." The charge did not reference a request for reasonable accommodation and contains no allegation that Randstad ever denied any such request.

## II. LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Courts must construe the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Waterhouse v. District of Columbia, 298 F.3d 989, 991–92 (D.C.Cir.2002); Dunaway v. Int'l Bhd. of Teamsters, 310 F.3d 758, 761 (D.C.Cir.2002). A party opposing a properly-supported motion for summary judgment "may not rest upon the mere allegations or denials of [her] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); see Weigert v. Georgetown Univ., 120 F.Supp.2d 1, 5 (D.D.C.2000) ("For any non-movant, 'including a discrimination plaintiff, to survive a motion for summary judgment, [she] must do more than present conclusory allegations of discrimination; concrete particulars must be presented to substantiate the discrimination claim.'" (quoting Siragy v. Georgetown Univ., 1999 WL 767831, *2, 1999 U.S. Dist. LEXIS 21021, at *7 (D.D.C. Aug. 20, 1999))).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although courts should not weigh the evidence or make credibility determinations when reviewing a motion for summary judgment, a genuine factual issue does not exist "when the evidence favoring the nonmoving party is merely colorable or is not significantly probative." Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir.1997); see Anderson, 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. ANALYSIS

This lawsuit began as a discriminatory discharge claim. Ms. Bugg–Barber now concedes that Randstad terminated her because of her conduct. She argues, however, that "even if the conduct [she] engaged in was inappropriate ... Randstad should have excused it because it was caused by [her] diabetic condition." Randstad St. ¶ 91 (quoting Pl. Dep. at 198–99). She states:

It is not disputed that Randstad terminated Ms. Bugg–Barber because of its perception of her conduct on December 29, 2000. The question is not whether Randstad's claim that it fired Ms. Bugg–Barber for misconduct is a pretext for disability discrimination. Rather the question is whether its actions were in breach of its accommodation obligations under the Act.

Pl. Opp. at 20; see also Pl. Opp. at 1 (alleging that "Ms. Bugg–Barber was a 'qualified individual with a disability' as defined in the ADA; that the behavior which assertedly prompted her termination was caused by her disability; that Randstad knew or should have known this

to be so; and that the conduct could readily have been accommodated without undue hardship"). In contrast, Randstad asserts in its motion that Ms. Bugg–Barber is not "disabled" within the meaning of the ADA, that she is not "qualified" for her position due to her inappropriate behavior (even if she has a disability), that she never made a request for an accommodation that was denied, that she was not terminated because of her alleged disability, that Randstad had legitimate non-discriminatory reasons to discharge her, and that her reasonable accommodation claim fails as a matter of law because it was not part of her EEOC charge.

The ADA prohibits a covered employer from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees[.]" 42 U.S.C. § 12112(a). The definition of "discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business[.]" 42 U.S.C. § 12112(b)(5)(A). "Under the ADA's scheme, then, it is discriminatory for a covered employer to decline to take reasonable steps to accommodate an employee's disability, unless the steps in question 'would impose an undue hardship[.]' " *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1300 (D.C.Cir.1998).

To establish a *prima facie* case for failure to accommodate under the ADA, Ms. Bugg–Barber must show: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Scarborough v. Natsios*, 190 F.Supp.2d 5, 19 (D.D.C.2002) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 387 n. 11 (4th Cir.2001)) (internal quotation marks omitted). As such, Ms. Bugg–Barber "carries the burden of proving by a preponderance of the evidence that she has a disability, but with a reasonable accommodation (which she must describe), she can perform the essential functions of her job." *Flemmings v. Howard Univ.*, 198 F.3d 857 (D.C.Cir.1999).[6]

### A. Qualified Individual with a Disability

Randstad cites several cases in which courts—from the Supreme Court to district courts—have held that diabetes is not an ADA-covered "disability." *See, e.g., Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483–84, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) ("A diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes.... This is contrary to both the letter and the spirit of the ADA."); *Fraser v. U.S. Bancorp*, 168 F.Supp.2d 1188, 1194–95 (D.Or.2001) (granting summary judgment to employer on ADA claims brought by a "brittle" diabetic). The question depends on the degree to which a medical condition substantially limits a major life activity, as mitigated by any medication or other measures. *See Sutton*, 527 U.S. at 482, 119 S.Ct. 2139 ("A 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,'

---

6. Ms. Bugg–Barber agrees that the DCHRA is interpreted in a manner consistent with federal law. *See* Pl. Opp. at 1 n. 1.

or 'would' be substantially limiting if mitigating measures were not taken."). Ms. Bugg–Barber tests her own blood sugar, injects insulin, takes glucose tablets, snacks or juice as needed, and still experiences significant fluctuations in her blood sugar levels. Randstad argues that she is inattentive to her own medical needs, citing evidentiary support. Even assuming that to be true, the Court cannot ignore Ms. Bugg–Barber's own testimony, supported by Dr. Pinzone, concerning the erratic effects of diabetes on her life. The EEOC non-exhaustively defines major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *see Sutton,* 527 U.S. at 480, 119 S.Ct. 2139. Ms. Bugg–Barber's diabetes substantially affects her abilities to perform manual tasks when it is wildly out of kilter. Dr. Pinzone's testimony is clear that Ms. Bugg–Barber can*not* totally control her diabetes. While the question is close because of the internal conflicts in the statements of both Ms. Bugg–Barber and her physician as to the impact of *this* disease on *this* plaintiff, for purposes of summary judgment, the Court finds that there is a genuine issue over whether Ms. Bugg–Barber has a "disability" within the meaning of the ADA when she experiences wide fluctuations in her blood sugar.[7]

▮▮▮ Turning to the related issue of whether Ms. Bugg–Barber is a "qualified individual" under the ADA, Randstad directs the Court to cases holding that abusive, threatening, disobedient, or insubor-

dinate conduct in the workplace renders an individual unqualified for a position. *See, e.g., Weigert v. Georgetown Univ.,* 120 F.Supp.2d 1, 15 (D.D.C.2000) (employee who could not interact compatibly with co-workers on research projects was not qualified); *Bonneville v. Blue Cross & Blue Shield of Minnesota,* No. 99–3241, 2000 WL 688226, *1, 2000 U.S.App. LEXIS 11905, at *4 (8th Cir. May 30, 2000) (unpublished opinion) (employee who engaged in outbursts was not qualified); *McRae v. Potter,* No. 99 C 8292, 2002 WL 653894, *6, 2002 U.S. Dist. LEXIS 6977, at *17 (N.D.Ill. Apr.19, 2002) (employee who made threats was not qualified under the Rehabilitation Act); *Palmer v. Circuit Court of Cook County,* 905 F.Supp. 499, 508–09 (N.D.Ill.1995) (employee who exhibited "disruptive and abusive behavior" was not qualified), *aff'd,* 117 F.3d 351 (7th Cir.1997); *Mazzarella v. United States Postal Serv.,* 849 F.Supp. 89, 95 (D.Mass. 1994) (employee's "aggressive outburst" rendered him unqualified under the Rehabilitation Act); *Mancini v. General Elec. Co.,* 820 F.Supp. 141, 147 (D.Vt.1993) (insubordinate employee was not qualified under the Vermont Fair Employment Practices Act); *Dowden v. Tisch,* 729 F.Supp. 1137, 1138 (E.D.Tex.1989) (employee who did not "obey orders" was not "otherwise qualified" under the Rehabilitation Act). "Case law permits an employer to terminate an employee because of egregious misconduct, irrespective of whether the employee is disabled." *Weigert v. Georgetown Univ.,* 120 F.Supp.2d 1, 20 (D.D.C. 2000). This record does not support application of these precedents because Ms.

7. Randstad has moved to strike Dr. Pinzone's affidavit, although not his deposition testimony. It argues that the affidavit reaches legal, not medical conclusions, is based on Ms. Bugg–Barber's condition one year after the events in question and therefore is suspect, is based on speculation and not fact, and is inadmissible. The affidavit is certainly weak support for Ms. Bugg–Barber's case, in large measure because of the infirmities pointed out by Randstad. The Court does not rely on it, but turns instead to Dr. Pinzone's deposition testimony. Given the disposition of this matter, the motion to strike is denied as moot.

Bugg–Barber's conduct—although wholly inappropriate in her workplace—was not so repetitious or egregious as to deprive her of being qualified for her job as a matter of law. In addition, a person's status as a "qualified" individual under the ADA is determined "with or without reasonable accommodation." *Id.* at 6. Ms. Bugg–Barber has never articulated what accommodation might be appropriate or necessary for her disability. Without that insight, the Court cannot determine whether, with a reasonable accommodation, she can perform the essential functions of the employment position she held (or desired). *See Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1300–01 (D.C.Cir.1998) (rejecting a claim that an employee's inability to perform his orderly job, even with a reasonable accommodation, rendered him ineligible for the reasonable accommodation of reassignment). Because the facts at this stage must be construed in favor of the non-moving party, the Court concludes that a genuine issue exists over whether Ms. Bugg–Barber is a "qualified" person with a disability.

## B. Knowledge

■ The next issue is whether and to what extent Randstad knew or should have known about Ms. Bugg–Barber's disability. There is some disagreement about the amount of information available to Randstad on the nature and impact of Ms. Bugg–Barber's diabetes as of December 29, 2000; however, the Court will accept the facts as presented by Ms. Bugg–Barber for purposes of summary judgment. Ms. Bugg–Barber testified in deposition that she told Mses. Palmer and Wheeler in October 2000 about her diabetic attacks, such as "involuntary movement of the arms. The drooling. The sweats. The disoriented state. Not able to sit up in chairs. The irritability." Pl. Dep. at 110. In addition, Ms. Bugg–Barber states that she told Ms. Palmer that she (Ms. Bugg–

Barber) had "been told that [Ms. Bugg–Barber] had been combative and [Ms. Palmer] said we just know to stay out of [Ms. Bugg–Barber's] way in a sarcastic type comment." *Id.* at 111.

Despite this reported conversation, Randstad admittedly did not have full appreciation of Ms. Bugg–Barber's condition. *See* Pl. Opp. at 23 ("Ms. Wheeler may well be telling the truth when she says that she did not at the time appreciate the significance" of Ms. Bugg–Barber's statement to "leave her alone because her blood sugar was up."). Ms. Bugg–Barber had not provided sufficient information for her supervisors—lay persons, not medical professionals—to know or recognize that her anger and sullenness on December 29, 2000, and tirade and threats on January 2, 2001, might be related to her diabetes. Because many diabetics are able to control their blood sugar levels, *see Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483–84, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), knowledge that an employee has diabetes does not necessarily translate to knowledge that misconduct is caused by that condition. Ms. Bugg–Barber, who could recognize the onset of a blood sugar problem, never alerted anyone to her difficulty. She failed to make the issue clear even on January 2, 2001, when she might have spoken with Mses. Palmer or Wheeler, and when she met with Ms. Hadidian. Notably, Ms. Bugg–Barber and Ms. Hadidian had engaged in a single conversation (when Ms. Bugg–Barber was first interviewed) about Ms. Bugg–Barber's need to arrange lunch times appropriately. Ms. Bugg–Barber had never discussed her diabetes with Ms. Blessing, her manager and the person who made the termination decision.

## C. Accommodation Obligations

Ms. Bugg–Barber attempts to connect her discharge with her disability by argu-

ing that her diabetes caused the misconduct that led to her termination and that, therefore, she was discharged "because of" her diabetes. *See* Pl. Opp. at 20. Since it is clear that Ms. Bugg–Barber was terminated "because of" her conduct, joining her discharge with her disability really amounts to an argument that Randstad had an obligation to accommodate her conduct, as it derived from a disability of which Randstad had knowledge. Thus, the Court agrees with Ms. Bugg–Barber that the central issue in this case is whether Randstad had a legal obligation to respond to her conduct on December 29, 2001, in any way different from its actual response.

In interpreting and enforcing the ADA, courts have drawn careful lines to protect the availability of employment for persons with disabilities, while not extending the contours of those protections to disallow the normal operation of workplace discipline. An employer must "mak[e] reasonable accommodations to the known physical or mental limitations" of an employee. 42 U.S.C. § 12112(b)(5)(A). This provision requires an "employer [to] be willing to consider making changes in its ordinary work rules ... in order to enable a disabled individual to work." *Vande Zande v. Wisconsin*, 44 F.3d 538, 542 (7th Cir.1995). However, "[a]n underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C.Cir.1999). "If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." *Woolcott v. E.I. DuPont de Nemours & Co.*, No. 95–CV–0721, 1997

WL 251475, **4–5, 1997 U.S. Dist. LEXIS 6700, at *20 (W.D.N.Y. Apr. 29, 1997) (quoting *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.1996)). The employee bears the burden of requesting a necessary accommodation and, absent such a request, an accommodation claim fails. *See Evans v. Davis Mem'l Goodwill Indus.*, 133 F.Supp.2d 24, 28 (D.D.C.2000); *Becker v. Gallaudet Univ.*, 66 F.Supp.2d 16, 22 (D.D.C.1999) ("[T]he ADA does not impose a general duty on an employer to provide unrequested accommodations."). Contrary to Ms. Bugg–Barber's argument, the standard is not whether "the conduct *could readily have been accommodated* without an undue hardship." *See* Pl. Opp. at 1 (emphasis added). Her argument does nothing to demonstrate that Ms. Bugg–Barber ever requested an accommodation that was denied.

Ms. Bugg–Barber's diabetes is a condition that affects her ability to work only on an irregular basis. It is not visible to any outsider that Ms. Bugg–Barber may be experiencing the onset of a blood sugar imbalance. It is peculiarly and solely within Ms. Bugg–Barber's knowledge whether, at any point in time, her blood sugar is in balance and she can work without any accommodation or whether her blood sugar is out of balance and she needs some kind of accommodation.[8] Consequently, it was necessary for Ms. Bugg–Barber to notify her employer on a timely basis—*before* her conduct became unruly in a business setting—that she needed an accommodation of some sort. In the hushed confines of a call center, with many people in small cubicles engaged in constant telephone conversations, it is not legally required that an employer discover

---

8. Randstad showed itself willing to accommodate her needs to the extent they were understood—*i.e.*, arrangement of lunch times, being excused from her cubicle to visit the PBGC nurse to check her blood sugar levels, snacks and drinks at her desk to maintain her blood sugar levels, and breaks to administer insulin as needed.

that a diabetic employee needs an accommodation *after* a noisy scene and insubordinate behavior. Ms. Bugg–Barber is the only person with knowledge of her status and she bears the responsibility of timely notifying her employer of her need for an accommodation. This she completely failed to do, either on December 29 or even on January 2.

Ms. Bugg–Barber testified that she made no request for an accommodation that was ever denied. *See* Bugg–Barber Dep. at 131–33. The Court does not consider an angry "leave me alone" from an employee to her supervisor to constitute a request for an accommodation under the ADA. Even assuming, for sake of this summary judgment motion, that it were a proper request, the Court concludes that Randstad met its obligation. When the noise level of Ms. Bugg–Barber's interaction with Ms. Wheeler attracted the attention and presence of Ms. Palmer and Mr. Johnson, Ms. Palmer instructed Ms. Wheeler to return to her own work station and she did, indeed, leave Ms. Bugg–Barber alone for the rest of the day. Despite this accommodation, Ms. Bugg–Barber failed to call or meet with Ms. Palmer at the end of the day, and neglected to call later or explain the situation on Tuesday, January 2, 2001.

Ms. Bugg–Barber has failed even to this date to identify what other "accommodation" she believes that Randstad owed to her on December 29, 2000. This is no mere matter of curiosity, but a question of whether *any* accommodation on that date would have been sufficient. December 29 was a Friday and Ms. Bugg–Barber did not return to work until Tuesday, January 2. According to the record, she was still in the grip of a serious blood sugar imbalance on January 2, so serious that she later spent nine days in the hospital. When she came into work on January 2, Ms. Bugg–Barber failed to speak to either of her supervisors to explain her situation or to ask for an accommodation of some kind, such as time off. She then went into a "tirade" and threatened Ms. Palmer. Given her silence on January 2 and her continued silence up to the present on this issue, the Court concludes that Ms. Bugg–Barber is not looking for an "accommodation" under the ADA, but a complete pardon. This the law does not require. *See, e.g., Woolcott v. E.I. DuPont de Nemours & Co.,* No. 95–CV–0721, 1997 WL 251475, *5, 1997 U.S. Dist. LEXIS 6700, at *21 (W.D.N.Y. Apr. 29, 1997) ("The ADA neither envisions nor requires that an employee must be given another opportunity despite [her] misconduct for which [she] was … terminated."); *Siefken v. Village of Arlington Heights,* 65 F.3d 664, 666 (7th Cir.1995) (second chance was not required for diabetic employee who failed to manage his disease); *Den Hartog v. Wasatch Acad.,* 909 F.Supp. 1393, 1402 (D.Utah 1995) (ADA does not require employer to rescind discipline for misconduct).

### D. Scope of EEOC Charge

 Randstad argues that Ms. Bugg–Barber did not allege a reasonable accommodation claim in her EEOC charge and may not pursue such a claim as part of this lawsuit. Ms. Bugg–Barber has not discussed—or rebutted—this point in her response. The purpose of the charge and government investigation is to address and resolve discrimination charges as quickly and inexpensively as possible, without the cost and duration of formal litigation. The scope of any subsequent lawsuit is limited to "the administrative investigation that can reasonably be expected to follow the charge of discrimination," *Marshall v. Fed. Express Corp.,* 130 F.3d 1095, 1097 (D.C.Cir.1997) (quoting *Park v. Howard Univ.,* 71 F.3d 904, 907 (D.C.Cir.1995) (internal quotation marks omitted)), to make

sure that this administrative process has an opportunity to work.

Ms. Bugg–Barber's EEOC charge alleged that she was "unjustifiably discharged" on the basis of her disability. It did not mention or allege that she had requested a reasonable accommodation or that Randstad had denied her request. The date of the alleged discrimination was identified as January 2, 2001, the date of her termination, and not December 29, 2000, the date on which she now argues that she should have received an unidentified accommodation.

In the alternative to its decision on the merits, the Court agrees with Randstad that Ms. Bugg–Barber's EEOC charge did not encompass her failure to accommodate claim set forth in this lawsuit. Therefore, that issue is not properly presented to this Court. *See id.* at 1098 (dismissal of accommodation claim that was not covered by EEOC charge).

## IV. CONCLUSION

For purposes of summary judgment, the Court concludes that there is a genuine issue of material fact over whether Ms. Bugg–Barber is a qualified individual with a disability under the ADA. Even so, her claim that Randstad failed to accommodate her diabetes fails because (i) she had not requested an accommodation with respect to her conduct in December 2000 and January 2001, (ii) nonetheless, Randstad reasonably accommodated that conduct under the circumstances, and (iii) she failed to exhaust her administrative remedies for this claim. For these reasons, the motion for summary judgment is granted. A separate order accompanies this memorandum opinion.

## ORDER

For the reasons stated in the Memorandum Opinion that accompanies this Order, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment is GRANTED. It is

**FURTHER ORDERED** that Defendant's Motion to Strike is DENIED as moot. It is

**FURTHER ORDERED** that Plaintiff's Complaint is **DISMISSED**.

**SO ORDERED.**