# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 17, 2007       Decided December 4, 2007

No. 06-7133

CAROLYN SINGH,
APPELLANT/CROSS-APPELLEE

v.

GEORGE WASHINGTON UNIVERSITY SCHOOL OF MEDICINE
AND HEALTH SCIENCES, ET AL.,
APPELLEES/CROSS-APPELLANTS

———

Consolidated with
06-7134

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01681)

———

*Bruce Fein* argued the cause and filed the briefs for appellant/cross-appellee.

*Carol A. Lafond* argued the cause for *amicus curiae* the National Disability Rights Network in support of cross-appellee. With her on the brief were *John M. Nonna* and *Richard J. Cairns*.

*Henry Morris, Jr.*, argued the cause and filed the briefs for appellee/cross-appellant George Washington University School of Medicine and Health Sciences.

*Robert A. Burgoyne* was on the brief for *amici curiae* Association of American Medical Colleges, et al., in support of appellees.

Before: GINSBURG, *Chief Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:  Carolyn Singh was a medical student at George Washington University ("GW") from 2000 until she was dismissed for academic reasons in 2003.  Singh later sued GW, saying that it had violated the Americans with Disabilities Act ("ADA") by failing to accommodate her alleged learning disabilities.

Singh began her medical studies after a high school and undergraduate career that both parties describe as illustrious, despite Singh's inferior performance—as she sees it—on timed multiple-choice tests as opposed to other means of assessment.  Due in part to her poor performance on certain multiple-choice tests, such as the Medical College Admission Test ("MCAT"), she was admitted to a decelerated program at GW, with a reduced courseload and heightened standards for academic dismissal.  There she received failing or unsatisfactory grades in several courses, based in part on multiple-choice examinations.  A faculty committee recommended to the school's dean, John Williams, that he dismiss her.  Shortly thereafter Dr. Anne Newman, an independent professional psychologist chosen by Singh from a short list recommended by GW's Disability Support Services,

diagnosed Singh with dyslexia and a mild disorder of processing speed, and recommended various accommodations to improve her performance. Singh communicated the diagnosis and a request for accommodations to Dean Williams, who shortly thereafter sent her a written notice of dismissal.

After Singh brought suit, both sides moved for summary judgment as to whether she had a disability. The ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A). Thus, a plaintiff "is disabled under the ADA if: (1) he suffers from an impairment; (2) the impairment limits an activity that constitutes a major life activity under the Act; and (3) the limitation is substantial." *Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004). The district court granted Singh partial summary judgment on the issue of impairment, holding that she "suffers from some kind of mental impairment," either "a learning disability" or a "psychiatric disorder such as depression." *Singh v. George Washington Univ.*, 368 F. Supp. 2d 58, 63 (D.D.C. 2005). But it denied summary judgment for Singh or for GW on the issue of substantial limitation, which it reserved for trial. *Id.* at 63, 68.

After a bench trial, the district court found that Singh had failed to prove that she was disabled under the ADA; it then entered judgment for GW. *Singh v. George Washington Univ. Sch. of Med. & Health Scis.*, 439 F. Supp. 2d 8 (D.D.C. 2006). Singh appeals. GW cross-appeals, though it need not have, as it sought no change in the final judgment in its favor. *Mass. Mut. Life Ins. Co. v. Ludwig*, 426 U.S. 479, 480-81 (1976) (per curiam); *Freeman v. B & B Assocs.*, 790 F.2d 145, 150-51 (D.C. Cir. 1986). In reality, GW seeks only affirmance of the judgment, either on the grounds of the district court's latest opinion or on the basis of arguments that the district

court rejected in various interlocutory rulings. We find GW correct in two of these arguments. Although corrections in favor of the appellee would normally tend to support affirmance, we cannot affirm but must remand to the district court for reasons developed below.

* * *

GW objects to four adverse interlocutory rulings rendered at the summary judgment stage. It contends (1) that the district court chose the wrong comparison group by which to measure Singh's "substantial limitation"; (2) that the court misidentified the relevant "major life activity"; (3) that Singh's request to GW for reasonable modifications under Title III was untimely; and (4) that Singh is not "otherwise qualified" to attend GW, even with reasonable modifications to the University's program. We resolve issues (1) and (2) in favor of GW, and issues (3) and (4) in favor of Singh.

*Substantial limitation*. Singh argued below that she was substantially limited in the major life activity of learning as compared "with a population of similar age and education level," or, alternatively, "with what [she] could achieve if she was either free of her learning disabilities or was provided reasonable accommodations." Mem. P. & A. Supp. Pl.'s Cross Mot. Summ. J. & Opp'n Defs.' Mot. Summ. J. ("Mem. P. & A.") 6. On summary judgment, the district court held that "an ADA plaintiff can be substantially limited . . . based on comparisons of her success to others of comparable age and educational background." 368 F. Supp. 2d at 67. Thus "[m]edical students, while in medical school, can only compare their test scores to their fellow students." *Id*. GW argues that the proper standard is whether Singh's limitation is substantial as compared to the average person in the general population. We agree with GW.

The ADA never defines the term "substantially limits." Its plain text (as the district court notes) "never speaks of making a comparison." *Id*. Yet "substantial[]" is an inherently relative term, one that demands some further standard of measure—as do the synonyms "'considerable' or 'to a large degree,'" offered by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 196 (2002). In speaking of the major life activity of performing manual tasks, the Court required that an impairment "*prevent*[] *or severely restrict*[] the individual from doing activities that are of central importance to *most people*'s daily lives." *Id*. at 198 (emphasis added). It added that the statutory text must "be interpreted strictly to create a demanding standard for qualifying as disabled." *Id.* at 197.

The Court's language suggests a comparison to the general population, rather than to persons of elite ability or unusual experience. A restriction qualifies as "severe[]" only if it limits the impaired individual in the context of what "most people" do in their "daily lives." Thus *Wong v. Regents of the University of California*, 410 F.3d 1052 (9th Cir. 2005), in applying *Toyota Motor*, asked "whether [plaintiff's] impairment substantially limited his ability to learn as a whole, for purposes of daily living, as compared to most people," not whether he could "keep up with a rigorous medical school curriculum." *Id*. at 1065. Similarly, most Americans could not run a marathon, and few would regard someone who can run a marathon—but no further—as "severely restrict[ed]" in the major life activity of walking. Thus, an injured ultramarathoner, who could once run 100 miles at a time, is not disabled by an impairment that forces him to quit after 26.2 miles, even though his limitation is substantial as compared to his unimpaired abilities or those of his erstwhile running partners.

The average-person criterion also appears inherent in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), which required the consideration of corrective measures (such as eyeglasses for the visually impaired) in assessing disability. "Because petitioners allege that with corrective measures their vision 'is 20/20 or better' . . . , they are not actually disabled within the meaning of the Act if the 'disability' determination is made with reference to these [corrective] measures." *Id*. at 481. In a case decided the same day, *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999), the Court extended that principle to *non*-artificial offsetting measures, namely a vision-impaired person's "learn[ing] to compensate for the disability by making subconscious adjustments to the *manner* in which he sensed depth and perceived peripheral objects." *Id*. at 565. The Court went on: "We see no principled basis for distinguishing between measures undertaken with artificial aids, like medications and devices, and measures undertaken, whether consciously or not, with the body's own systems." *Id*. at 565-66. Similarly, a plaintiff's diligent study or high background intelligence may serve to mitigate the effects of a learning-related impairment and allow a high level of functioning. Yet measuring Singh's limitations by comparison to her hypothetical achievements without impairment, to her fellow medical students, or to others of similarly elite educational background (individuals selected in part on the basis of their intelligence and dedication), would place the same mitigating factors on both sides of the comparison, rendering them effectively irrelevant.

It is intuitively appealing to measure limitation by comparing the plaintiff's condition impaired with her own condition, unimpaired. There is something poignant, in some cases even tragic, in the plight of a person cut off from exceptional achievement by some accident of birth or history. But the ADA is not addressed to that plight. Rather, it is designed to enable the disabled, as a group, to participate in

mainstream society. The statute notes that "historically, society has tended to isolate and segregate individuals with disabilities"; that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally"; and that "individuals with disabilities are a discrete and insular minority who have been . . . relegated to a position of political powerlessness." 42 U.S.C. § 12101(a)(2), (6), (7). Congress found that discrimination denies this group "the opportunity to compete on an equal basis . . . , and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity"; the ADA therefore seeks to offer the disabled "equality of opportunity, full participation, independent living, and economic self-sufficiency." *Id*. § 12101(a)(8)-(9). A plaintiff who, despite an impairment, can participate in all major life activities at the level of the average person in the general population neither is denied "independent living and economic self-sufficiency," nor burdens society with "dependency and nonproductivity," nor falls within the kind of "isolate[d] and segregate[d]" minority described by the statute's text. The ADA promotes equal opportunity for the disabled, but only after *Toyota Motor*'s "demanding standard" is met.

This understanding gains credence from its adoption by executive agencies purporting to define "substantially limits." The ADA does not delegate authority to any agency to define "disability" or its component terms by regulation, see *Sutton*, 527 U.S. at 479, yet both the Equal Employment Opportunity Commission ("EEOC") and the Department of Justice ("DOJ") have done so. The EEOC describes an individual as substantially limited if she is either "[u]nable to perform a major life activity that the average person in the general population can perform," or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform [the major life activity] as compared to the condition,

manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(i)-(ii). The DOJ similarly defines "substantially limited" as being "restricted as to the conditions, manner, or duration under which [the major life activity] can be performed in comparison to most people." 28 C.F.R., pt. 36, app. B. It illustrates this definition by noting that "[a] person who can walk for 10 miles continuously is not substantially limited in walking merely because, on the eleventh mile, he or she begins to experience pain, because most people would not be able to walk eleven miles without experiencing some discomfort." *Id.*

Without deciding what respect these regulations are due, see *Sutton*, 527 U.S. at 480, we note that the average-person standard is currently the law in all of our sister circuits to have addressed the matter, some of those circuits according a degree of deference (sometimes substantial) to the agency interpretations. See *Wong*, 410 F.3d at 1065; *Ristrom v. Asbestos Workers Local 34 Joint Apprentice Comm.*, 370 F.3d 763, 769 (8th Cir. 2004) (asking whether the plaintiff's impairments "limit his ability to learn to a considerable or large degree as compared to the average person in the general population"); *Palotai v. Univ. of Md. at Coll. Park*, 38 F. App'x 946, 955 (4th Cir. 2002) (comparing the plaintiff to the "average person in the general population"); *Emerson v. N. States Power Co.*, 256 F.3d 506, 511 (7th Cir. 2001) (employing the average-person standard in the context of learning); *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 81-82 (2d Cir. 2000) ("[T]he proper reference group is 'most people,' not college freshmen."); *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 627 (6th Cir. 2000) ("[T]he ADA compares the performance of an individual who alleges a restriction in a major life activity to that of 'most people.'"); *Bowen v. Income Producing Mgmt. of Okla., Inc.*, 202 F.3d 1282, 1287-88 (10th Cir. 2000) (noting that plaintiff was not

substantially limited in his ability to learn given that "even after his injury, [plaintiff] retained greater skills and abilities than the average person in general"); *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 156 (1st Cir. 1998) (holding that, because a student's "achievement remained consistently above average," the plaintiffs had not "met their burden of showing a probability of success that [he] suffered a substantial limitation of a major life activity"); *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 15-16 (1st Cir. 1997) ("[Limitation] is to be measured in relation to normalcy, or, in any event, to what the average person does.").

In contrast, the district court relied on and extended the EEOC's separate definition of substantial limitation in the purported major life activity of working,[1] a definition that compares individuals to "the average person having comparable training, skills and abilities" in their ability "to perform a class of jobs or a broad range of jobs in various classes." 29 C.F.R. § 1630.2(j)(3)(i). The district court found this "more specific" comparison to be "more applicable," and it therefore read the EEOC's regulations to require comparisons "to people of similar age and educational background" in the activity of learning as well. 368 F. Supp. 2d at 66. This was a misreading of the regulations. The EEOC includes learning among a list of many major life activities, 29 C.F.R. § 1630.2(i), and applies the comparable-training standard only to working. We are reluctant to extend the EEOC's comparable-training standard beyond the agency's own regulations, especially in light of *Toyota*

---

[1] Neither the Supreme Court, see *Toyota Motor*, 534 U.S. at 200, nor this court, see *Duncan v. Wash. Metro. Area Transit Auth.*, 240 F.3d 1110, 1114 n.1 (D.C. Cir. 2001) (en banc), has yet decided whether working is a major life activity.

*Motor*'s observation that "[n]othing in the text of the [ADA], our previous opinions, or the regulations suggests that a class-based framework [of major life activity analysis] should apply outside the context of the major life activity of working." 534 U.S. at 200.

Singh defends the district court's comparison to those of "similar age and educational background" on the ground that it would be unreasonable to compare her to "newborns" and "centenarians." Singh Reply Br. 23. But the statutory findings describe the disabled population as "increasing as the population as a whole is growing older," 42 U.S.C. § 12101(a)(1), which would be inconsistent with a definition of disability that controls for age. Moreover, an age-based comparison might have perverse consequences for the ADA's application. If a 97-year-old woman with hip problems has difficulty walking, it would be strange to tell her that she walks at least as well as the average 97-year-old—that is, not well at all—and is therefore not disabled or entitled to reasonable accommodations.

While we need not explore the ADA's outer reaches to decide this case, it seems that the law may already provide sensible means of addressing extreme age or youth. For one thing, the medical definition of an *impairment* will frequently make reference to age; the mental development of a six-year-old is fine for six-year-olds, but not for their parents. For another, the ADA requires that the impairment be the effective *cause* of the plaintiff's limitation; a newborn with a malformed foot cannot walk as well as the average person, but he is not disabled under the ADA, because even perfectly healthy newborns cannot walk. Thus, if a dyslexic seven-year-old cannot learn as well as the average person, a court might begin by comparing his learning ability to that of the average seven-year-old, cf. *Bercovitch*, 133 F.3d at 156, using

the comparison to clarify how much limitation the impairment is responsible for.

Finally, we note that any measure of substantial limitation that might change based on a plaintiff's particular educational environment—e.g., a comparison of "[m]edical students . . . to their fellow students," *Singh*, 368 F. Supp. 2d at 67—would make disabled status vary with a plaintiff's current career choices, and would fail to achieve the ADA's additional purpose of providing "clear, strong, *consistent*, [and] enforceable standards" to address discrimination. 42 U.S.C. § 12101(b)(2) (emphasis added). And comparing the impaired plaintiff with the counterfactual unimpaired plaintiff would pose a similar risk of inconsistency, as it would sometimes require the court to speculate on the degree to which the sort of compensating mechanisms alluded to in *Albertson's* would have come into play in the absence of the impairment.

*Major life activity*. In moving for summary judgment, Singh claimed to be substantially limited in the major life activity of learning. Mem. P. & A. 5-6. On its own motion, however, the district court held that the parties—by "citing grades and scores back and forth"—had "reduced the activity of learning to the activity of test taking." 368 F. Supp. 2d at 64. While the court did not resolve whether test-taking is "itself a major life activity" or merely "a crucial component of the major life activity of learning," it concluded that "a plaintiff with an impairment that substantially limits her ability to perform on tests has an actionable ADA claim." *Id.*

While the district court rightly observed that tests are often the "gatekeepers to ever higher levels of learning," *id.*, its conclusion was nonetheless error. First, test-taking itself is

not a major life activity.[2]   In *Toyota Motor*, the Supreme Court defined "major life activities" as "those activities that are of central importance to daily life," including "such basic abilities as walking, seeing, and hearing," 534 U.S. at 197; see also *id.* at 198 (adding that an impairment must "prevent[] or severely restrict[] the individual from doing activities that are of central importance to *most people's* daily lives" (emphasis added)).

Second, *Toyota Motor* requires a plaintiff's limitation to be substantial in the context of the major life activity as a whole, and not that of a subclass within a major life activity. The petitioner there claimed to be disabled in "performing manual tasks" because she could not work with her arms at shoulder level for a substantial period of time.  534 U.S. at 201.  The Court, however, asked whether she could "perform the variety of tasks central to most people's daily lives," as opposed to the class of "tasks associated with her specific job."  *Id.* at 200-01.  As noted above, *Toyota Motor* found such a "class-based framework" inappropriate "outside the context of the major life activity of working."  *Id.* at 200.

Plainly picking a comparison *activity* presents a problem similar to that of picking a comparison *group*.  Every subdivision invites parallel subdivisions; if a difficulty with timed multiple-choice tests qualifies, why not difficulties in every other element of the learning process?  If a substantial limitation in any element of learning (and of every other recognized major life activity) were itself sufficient to show substantial limitation in a major life activity, the number of

---

[2] Because in the trial court Singh claimed only a limitation in learning, we need not decide whether other subcomponents of learning, such as reading or "processing information," constitute major life activities.

disabled would balloon far beyond the Court's understanding of Congress's intent.

Though we reject the idea that test-taking per se is a major life activity (or, equivalently, a "crucial component" thereof as envisioned by the district court), plaintiff's test-taking difficulties can obviously play a role in the "individualized assessment," required by *Toyota Motor*, 534 U.S. at 199; cf. *id*. at 200-01, of whether her limitation in the major life activity of learning is substantial. A plaintiff who is limited in only part of a major life activity—e.g., one who is severely nearsighted, or who can hear loud noises but not soft ones—may still be disabled under the ADA, but only if the limitation is substantial from the perspective of the major life activity as a whole. "The key obviously is the extent to which the impairment restricts the major life activity." *Knapp v. Nw. Univ.*, 101 F.3d 473, 481 (7th Cir. 1996).

*Timeliness*. Discrimination under Title III includes "a failure to make reasonable modifications in policies, practices, or procedures . . . unless the entity can demonstrate that making such modifications would fundamentally alter the nature of [the public accommodation]." 42 U.S.C. § 12182(b)(2)(A)(ii). GW argues that Singh's request for reasonable modifications was untimely, as she did not notify the school of her diagnosis or disability until a faculty committee had already recommended her dismissal. It further argues that it had no duty to modify its program for Singh without notice of her disability. See *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998); see also *Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 897-98 (D.C. Cir. 1998) (construing Title I); *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795 (1st Cir. 1992) (construing the Rehabilitation Act).

But Singh is not challenging GW's actions prior to notice. She challenges GW's actions *after* she informed the Dean of her diagnosis and requested modifications, when the University was in a position to respond. *Singh*, 368 F. Supp. 2d at 70. Thus, we need not address the case of the plaintiff who, once ousted on terms applicable to a non-disabled person, knocks on the door anew to seek reinstatement under the ADA.

While GW invokes a so-called "no second chance" doctrine to justify its refusal to accommodate Singh, see *id.* at 70-71, its argument confuses the issue of timeliness with the underlying reasonableness of the plaintiff's request. The precedential authorities cited by GW and *amici* relied on findings that the plaintiffs had failed to request any real accommodation, see *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999); *Siefken v. Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995); *Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp. 2d 120 (D.D.C. 2003), that further accommodations would not have been of any use, see *Southeastern. Cmty. Coll. v. Davis*, 442 U.S. 397, 403 (1979); *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1051 (9th Cir. 1999); *Bercovitch*, 133 F.3d at 154-55, that reasonable accommodations had already been advanced, see *Kaltenberger*, 162 F.3d at 436, or that the requested accommodations were unreasonable under the circumstances, see *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88 (2d Cir. 2004). None of these circumstances is found here. In particular, GW points to no major commitment of resources that would be wasted as a result of its having to consider Singh's accommodation claim at the time she raised it.

*"Otherwise qualified."* GW suggests as an alternative ground for affirmance that Singh is not "otherwise qualified" for GW's medical school, arguing that even had she received her requested modifications, she would still be incapable of

completing her studies. We first note legal uncertainty as to whether a Title III plaintiff must be "otherwise qualified" in this sense. Title III of the ADA contains neither the phrase "otherwise qualified" nor "qualified individual," but such phrases are in Titles I and II, as well as in the Rehabilitation Act. Compare 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, . . . or accommodations of any place of public accommodation . . . ."), with *id.* § 12112(a) ("No covered entity shall discriminate against a qualified individual with a disability . . . ."), *id.* § 12132 (referring to a "qualified individual with a disability"), and 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination . . . ."). Some courts have read an equivalent requirement into Title III. See *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006); *Bercovitch*, 133 F.3d at 154-55; see also *Kaltenberger*, 162 F.3d at 435.

Because of a procedural point, however, we need not address the substantive legal issue. The district court granted partial summary judgment to Singh on whether she was otherwise qualified, 368 F. Supp. 2d at 68-69, and GW makes no claim that the ruling was erroneous on the record then before the court, consisting most importantly of the deposition of Singh's expert witness, Dr. Newman. At trial Dr. Newman seemed uncertain on the issue, see Joint Appendix ("J.A.") 644-45, a wavering that GW characterizes as Singh's "re-open[ing]" the issue of qualifications. GW Br. 37 n.10. GW offers no authority holding that a party may unwittingly forfeit the benefit of partial summary judgment through inartful questioning of a trial witness. Facts found on partial summary judgment are taken as established at trial. Fed. R. Civ. P. 56(d). GW neither moved in the district court to vacate the partial summary judgment, cf. *Teleflex, Inc. v. Ficosa N. Am.*

*Corp.*, 299 F.3d 1313, 1321 (Fed. Cir. 2002), nor otherwise gave effective notice that it sought to disestablish the prior finding. A trial court's reopening of such an issue without notice to the parties is error, and reversible error if it causes substantial prejudice. *Leddy v. Std. Drywall, Inc.*, 875 F.2d 383, 386-87 (2d Cir. 1989). It is plainly impermissible for a party to lie low and then, the record having closed, label the testimony a "reopening."

\* \* \*

As we ordinarily review factual findings only under the deferential standard of clear error, it might seem that with GW having scored wins on two material legal issues, it would be easy to affirm the district court's decision in its favor. But when the trial court's route to its findings features self-contradiction and confusion, we may not so defer. *Lyles v. United States*, 759 F.2d 941, 944 (D.C. Cir. 1985). In such a case, "the appropriate disposition of the case is to vacate the district court's judgment and remand for further factfinding." *United States v. Wragge*, 893 F.2d 1296, 1299 (11th Cir. 1990) (per curiam). The opinion below focused on the elements of impairment and substantial limitation, as do we.

*Impairment*. In its discussion of impairment, the district court repeated its previous finding that Singh had "an impairment of some sort" at the time of her diagnosis, whether a learning disability or depression. 439 F. Supp. 2d at 13 (citing 368 F. Supp. 2d at 63). The court then doubted whether Singh had a learning disability, especially in light of her prior academic success: "Had she the disability [i.e., impairment] that she claims to have, her achievement should have been more consistently impaired [i.e., limited]." *Id.* Yet the court also rejected the depression hypothesis, stating that Singh "offered no evidence that her poor performance was

due to depression, and in fact disputed whether she was ever depressed." *Id.* at 14. In the end, the court flatly "decline[d] to make a finding as to her mental condition." *Id.* at 15 n.7. We cannot tell whether the court fully reversed its earlier finding of impairment, thus ruling on the point in favor of GW, or retained some finding of impairment.

Our review is made more difficult by the court's failure to state important factual findings specially in its "Findings of Fact," cf. Fed. R. Civ. P. 52(a), and by its intermixing of the legal standards of impairment with those of substantial limitation. For example, it doubted whether Singh's "success in other reading and comprehending tasks . . . is consistent with a reading disorder," adding in the next sentence that "[i]n any event, it is not consistent with a determination that the impairment substantially affects a major life activity." 439 F. Supp. 2d at 13-14.

The same problem infects the court's refusal, "for two reasons," to credit Singh's primary evidence of impairment, her diagnosis by Dr. Newman. *Id.* at 15. First, it found Dr. Newman to lack experience in diagnosing learning disabilities, and implied that her testimony therefore "failed to prove that plaintiff's difficulties are due to a learning disability." *Id.* This statement could mean that Singh suffered no learning disorder at all (reading "disability" to mean impairment), or that if she did, her academic troubles were caused by other factors (a substantial limitation issue). Second, the court noted that "a mere diagnosis [of an impairment] is not sufficient to establish a disability under the ADA," *id.* (footnote omitted)—which is true enough (assuming our bracketed insertion was intended), but the observation speaks only to the element of limitation, not impairment. Thus, we cannot be certain what findings the court would have made as to impairment had it addressed that issue independently.

*Substantial limitation*.  The district court considered Singh's evidence of substantial limitation "overwhelmingly anecdotal," *id.*, and gave it little weight, especially as compared to the testimony of GW's expert witness, Dr. Rick Ostrander.  Yet in doing so the court mischaracterized Dr. Ostrander's testimony, to a degree that undermines the reliability of its findings.

First, in opposition to Singh's claim of particularly poor performance on multiple-choice tests, the court stated that Dr. Ostrander "did not perceive plaintiff's record as reflecting glaring inconsistencies between multiple choice or reading tasks and tests in other areas or formats."  *Id*. at 15-16.  Dr. Ostrander testified at length as to Singh's performance on the Scholastic Aptitude Test ("SAT"), which he considered consistent with her intelligence, as measured by the Wechsler Adult Intelligence Scale ("WAIS").  J.A. 701-08, 711-13.  Yet, though he speculated as to whether Singh's MCAT scores were similarly consistent, J.A. 709-11, 713-14, he specifically refused to find either consistencies or inconsistencies in her record based upon her performance on any exams aside from the SAT and WAIS, citing insufficient data.  J.A. 720-26, 728-31, 737-41, 745-46.  Dr. Ostrander testified that the only "objective" data he or anyone could provide related to whether her SAT scores were consistent with her IQ as measured by the WAIS.  J.A. 722-26, 739-41.  Though the court's phrase is literally true, it seems to turn a gap in Dr. Ostrander's testimony into affirmative support for "consistency."

Second, the court described it as Dr. Ostrander's "professional opinion that [Singh's] performance worsened as she progressed into more competitive environments.  As she became surrounded by smarter peers, he testified, it is not surprising that she would find herself having to work harder." 439 F. Supp. 2d at 16.  These propositions are found nowhere

in Dr. Ostrander's testimony. While Dr. Ostrander did note that medicine is an "incredibly demanding field," J.A. 747, and that he considered Singh's performance in the sciences particularly modest, J.A. 714, he never attempted to compare her class performance in different environments or over time. As we have explained, Dr. Ostrander testified that he could speak only to her results on the SAT and WAIS.

Third, the court appeared to attribute to Dr. Ostrander the proposition that "based on her Scholastic Aptitude Test scores, [Singh's] achievement in medical school was not necessarily inconsistent with her abilities." 439 F. Supp. 2d at 16. While Dr. Ostrander testified that Singh's SAT and WAIS scores were consistent with each other, as noted above, he refused to compare her standardized test scores (or her innate abilities) with her performance on medical coursework.

We do not know how the district court would have weighed Singh's evidence against a proper understanding of Dr. Ostrander's testimony. This invites a remand. Cf. 19 Moore's Federal Practice—Civil § 206.03[7] ("A factual finding will also be clearly erroneous . . . if it is based on a fundamental confusion of the facts as revealed by the record.").

\* \* \*

The judgment below is vacated, and the case is remanded to the district court for a determination of whether Singh is disabled under the legal standards described above.

*So ordered.*