Jonathan SHAYWITZ, Plaintiff,

v.

AMERICAN BOARD OF PSYCHI-
ATRY AND NEUROLOGY,
Defendant.

No. 09 Civ. 4387(VM).

United States District Court,
S.D. New York.

Jan. 27, 2012.

David Boies, II, Boies, Schiller & Flex-
ner LLP, Armonk, NY, Philip M. Bowman,
Boies, Schiller & Flexner LLP, New York,
NY, for Plaintiff.

Gurbir Singh Grewal, Kostas D. Katsir-
is, Howrey LLP, New York, NY, Christo-
pher B. Sullivan, Jared Clayton Fields,
Snell & Wilmer, LLP, Salt Lake City, UT,
Scott Daniel McCoy, Howd & Ludorf,
Hartford, CT, for Defendant.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff Jonathan Shaywitz ("Shaywitz") brought this action against the American Board of Psychiatry and Neurology (the "Board") claiming violations of Title III ("Title III") of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12189, and the Sherman Act, 15 U.S.C. §§ 1, 2. In a Decision and Order dated December 17, 2009, *Shaywitz v. American Bd. of Psychiatry & Neurology*, 675 F.Supp.2d 376 (S.D.N.Y.2009), the Court dismissed Shaywitz's Sherman Act claims because of lack of standing.

Following discovery, the Board now moves for summary judgment on Shaywitz's ADA claim pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). In his ADA claim, Shaywitz alleges that the Board failed to accommodate his disability in administering its certification examination. For the reasons discussed below, the Board's motion is GRANTED.

## I. BACKGROUND [1]

### A. SHAYWITZ'S PERSONAL BACKGROUND

Shaywitz is a physician with a specialty in psychiatry. He obtained his medical degree from Harvard Medical School in 1998, with high honors in psychiatry, and completed his residency in psychiatry at the University of California Los Angeles in 2002.

When he was in elementary school, Shaywitz was diagnosed with dyslexia, a language-based learning disorder. Shaywitz attended speech therapy from kindergarten through the fifth grade and often received special accommodations in academic settings, including extended time and an individual room for tests. An evaluation conducted in 1999, when Shaywitz was twenty-nine years old, confirmed the dyslexia diagnosis and indicated that Shaywitz "continues to manifest significant difficulties in oral language, word retrieval, and fluency." (Bowman Decl. ex. 23.) Shaywitz has requested and received special accommodations on many standardized tests, including the PSAT, SAT, MCAT, and the USMLE I, II, and III.

In addition to dyslexia, Shaywitz was diagnosed in 1996 with a co-morbid panic, anxiety, and social anxiety disorder. Shaywitz asserts that his anxiety disorder aggravates the effects of dyslexia, which in turn heightens his anxiety, creating a performance-inhibiting "cycle." There is also some indication in the record that Shaywitz suffers from a heart condition, namely, cardiac arrhythmias.[2]

Despite his dyslexia and anxiety disorder, Shaywitz has succeeded academically and received commendation from professors, specifically lauding his clinical abilities. For example, a 1997 letter from two

1. The Court derives the factual summary from (1) the Board's Statement of Undisputed Material Facts In Support of Its Motion for Summary Judgment ("Def. 56.1 Statement"), dated July 22, 2011, and accompanying exhibits; (2) Shaywitz's Response to the Board's Statement of Undisputed Material Facts and Counterstatement of Additional Material Facts, dated August 29, 2011; (3) Declaration of Philip M. Bowman in Support of Shaywitz' s Memorandum of Law in Opposition to the Board's Motion for Summary Judgment ("Bowman Decl."), dated August 29, 2011, and accompa-

nying exhibits; and (4) Appendix of Testimony Cited in Support of Shaywitz's Memorandum of Law in Opposition to the Board's Motion for Summary Judgment, dated August 29, 2011. Except where specifically referenced, no further citation to these sources will be made.

2. In his Counterstatement of Undisputed Facts, Shaywitz provides no factual support for the cardiac condition alleged in the Complaint.

Harvard Medical School faculty members reported that "[Shaywitz's] clinical skills [in psychiatry] were superior and his rapport with patients and staff was excellent," and that "his accomplishments on this rotation were most impressive." (Bowman Decl. ex. 19.)

## B. BOARD CERTIFICATION

The Board is a non-profit corporation responsible for creating, maintaining, and administering physician certification standards in psychiatry, neurology, and related sub-specialties. The Board certifies physicians who demonstrate competence in clinical psychology by fulfilling the required certification criteria.

The Board annually publishes its certification criteria and procedures in a pamphlet titled "Information for Applicants." For physicians to be approved as Board-certified psychiatrists, the Board requires those physicians who entered residency prior to July 1, 2007 to receive passing scores on a written ("Part I") and oral ("Part II") examination. Part II consists of two sections: (1) an essay or audiovisual examination, and (2) a "live-patient" examination. During the live-patient portion of Part II, applicants must examine and discuss their findings regarding a real psychiatric patient. The live-patient examination is intended to assess the applicant's "clinical skills," including "[k]knowledge of basic science principles, special diagnostic procedures, management recommendations, and assessment of risk." (Def. 56.1 Statement ex. 4; Bowman Decl. ex. 5, at 7.)

The Board requires applicants to pass Part I before they may proceed to take Part II. A passing score on Part I remains valid for six years, or three opportunities to pass Part II, whichever occurs first. "Candidates who are unsuccessful in the Part II examination during the allotted time period [i.e., six years or three attempts] [are] required to retake the Part I examination." (Def. 56.1 Statement ex. 4.) In addition, an unexcused absence from the Part II examination counts against the three opportunities to pass Part II.

Evidence in the record, including e-mail correspondence and commissioned studies of Part II, suggests that there are concerns with adequate standardization and reliability of the live-patient portion of the Part II exam. In 2008, the Board eliminated the Part II exam as a requirement for candidates who began their first year of residency on or after July 1, 2007, or their second-year of residency on or after July 1, 2008. Part II remains a requirement for all other candidates, including Shaywitz, who completed his residency in 2002. Beginning in 2014, the Board will allow all applicants to apply for certification under the new requirements, which do not include the Part II exam. Rather than administering the Part II live-patient exam, clinical skills evaluations for Board certification are now administered within the individual applicant's residency program.

## C. BOARD POLICY REGARDING AC-COMMODATION OF DISABILI-TIES

In its Information for Applicants pamphlet, the Board details the procedure by which candidates for certification may obtain accommodations for disabilities during Part I and Part II of the exam. Applicants seeking accommodations for Part I must advise the Board in writing "no later than the deadline for submitting applications for examination," and must provide the Board with supporting documentation and evidence "substantiating the disability" no later than thirty days after the application deadline. (*Id.*)

In order to request accommodations for Part II, candidates must check a box on

the billing statement for Part II and "comply with all requirements regardless of previous requests and/or granted accommodations." (*Id.*) Documentation supporting the disability and requested accommodations is due no later than thirty days after the fee due date on the Part II billing statement.

Required documentation includes a completed "Application for Testing Accommodation," a diagnosis report, history of the disability, diagnostic information, and "specific requested accommodations." (*Id.*) The documentation "must identify a disability and provide a rationale for specified modifications to standard testing procedures." (*Id.*) According to the Information for Applicants pamphlet, "[a] description of any functional limitations associated with the disability is important to the Board's evaluation of the request." (*Id.*) If the Board denies a candidate's request for accommodation, the candidate may request a formal appeal in writing.

D. *SHAYWITZ'S ATTEMPTS TO PASS THE CERTIFICATION EXAMINATION*

Shaywitz submitted his Application for Certification to the Board in 2002, around the end of his residency. He checked a box on the application form requesting accommodations during the November 2002 Part I examination. In conformity with the Board's policy, Shaywitz then submitted the Application for Testing Accommodations. He informed the Board of his dyslexia, his history of accommodations on other examinations, and specifically requested "double time" and a "separate, individual quiet room free of external noises." (*Id.* ex. 9.) He also wrote a three-page letter to the Board, dated March 22, 2002, explaining his life-long struggle with dyslexia and how it affects his life. The Board approved Shaywitz's request for ac-

commodation on Part I by letter dated August 15, 2002. Shaywitz failed his first attempt to pass Part I in 2002. He repeated the registration procedure the following year, including the request for accommodation, and passed Part I in 2003 with his requested accommodations.

After passing Part I, Shaywitz registered to take the May 2004 Part II examination. However, on the billing statement for the May 2004 Part II examination, Shaywitz did not check the box indicating a request accommodation. The text next to the box read:

I request special examination assistance or a test modification during the examination due to a disability. I understand that documentation of a disability will be required no later than 30 days after the fee due date in order to receive accommodations. Refer to the *Information for Applicants* booklet for further information regarding applicants with disabilities.

Candidates requesting accommodations MUST check this box and comply with all requirements regardless of previous requests and/or granted accommodations.

(*Id.* ex. 14.) Shaywitz sat for the May 2004 Part II examination without accommodation. The Board informed him by letter on June 2, 2004 that he had passed the audiovisual portion of Part II, but had failed the live-patient exam.

Shaywitz appealed his failing score on the May 2004 Part II examination by submitting a three-page letter dated July 8, 2004 to the Board, He inquired whether there was a "mistake or mix-up" with his examination, discussed his qualifications for certification, and gave a detailed account of his performance on the live-patient exam. (*Id.* ex. 17.) On September 1, 2004, the Board informed him it was sustaining his failing score.

When Shaywitz registered to take Part II a second time in April 2005, he again did not check the box requesting accommodation on the billing statement. Once more, he passed the audiovisual component, but failed the live-patient exam. Shaywitz appealed to the Board by means of an eleven-page letter dated June 14, 2005, to which he appended several recommendation letters written on his behalf at various stages of his academic career. He rested his appeal on "(1) the evaluation of my performance in clinical situations by experienced psychiatrists with whom I have trained and worked; (2) my own evaluation . . . of my performance on the three components of the Patient Section . . . and (3) . . . the fact that I received passing marks on the Audiovisual Section." (*Id.* ex. 20.) The Board again sustained his failing score.

Shaywitz was scheduled to take Part II a third time in 2006. Again, he did not request accommodation by checking the box on the billing statement. This time, Shaywitz failed to appear for the exam for medical reasons that, according to Shaywitz, related to a cardiac episode. The Board ultimately excused his absence after Shaywitz provided documentation of visits to the emergency room, and rescheduled him for the May 2007 Part II exam.

On February 15, 2007, Shaywitz wrote a short letter to the Board, informing it that "I will be unable to attend during [the 2007 Part II exam]," and requesting a rescheduled date. (*Id.* at ex, 27.) The Board replied by letter on February 26, 2007, requesting documentation "of the medical or other emergency that prevents you from sitting for examination." (*Id.* ex. 28.) Shaywitz does not remember receiving this letter. On March 26, 2007, Shaywitz wrote to the Board,

I have a documented cardiac condition, and am uncertain whether it is medically safe for me to take the forthcoming exam. I have recently relocated from Washington DC to Indianapolis, Indiana and am in the process of obtaining a cardiologist in the area who can assess and monitor my situation. Accordingly, because of my physical disability and the potentially serious threat to my health, I have requested that my examination to be rescheduled [sic] . . . I believe the Board has all my personal medical information pertaining to this matter.

(*Id.* at ex. 29.) The Board replied in a letter dated March 27, 2007, advising Shaywitz once more that he needed to submit documentation and that his name remained on the roster of candidates for the May 2007 exam. Shaywitz never submitted further documentation. He sat for the exam in May 2007, and failed the live-patient portion for a third time.

On July 19, 2007, Shaywitz made a final appeal in a three-page letter to the Board. He asserted that the Board, by "administrative oversight" stemming from a loss of his Indianapolis address, had failed to grant him a temporary deferral, putting him in "the untenable position of either placing myself at a risk for a recurrence of a potentially lethal cardiac arrhythmia and the significant stress and anxiety associated with that very realistic concern or not taking the oral examination on May 7, 2007 and forfeiting the entire oral examination and certification." (*Id.* ex, 31.) The failing score, he said, "reflects, and is a measure of, my extreme anxiety rather than a true and fair reflection of my competence as a well-trained psychiatrist." (*Id.*) The Board denied his final appeal.

### E. *THE INSTANT LITIGATION*

According to the Board's policies, upon Shaywitz's failing Part II for a third time, his Part I passing score expired and he

would have to begin the examination process anew in order to become certified.

Instead, on September 10, 2007, Shaywitz, through his counsel, Boies, Schiller & Flexner LLP, contacted the Board by phone. According to Shaywitz, his counsel requested that the Board certify Shaywitz despite his lack of a passing score on Part II. Shaywitz's counsel submitted a written letter to the Board on September 24, 2007 (the "September 2007 Letter") detailing Shaywitz's qualifications as a psychiatrist, his attempts to pass Part II, and his "dyslexia, cardiac arrhythmias and anxiety." (*Id.* ex. 34.) In sum, his counsel wrote,

> [w]e believe there is no rational reason to deny Board certification to Dr. Shaywitz and that the [Board]'s actions in denying Dr. Shaywitz the opportunity to fully pursue his chosen profession on account of his medical condition and in continuing to apply concededly unreliable subjective filters to restrict Dr. Shaywitz's ability to compete for business opportunities is unlawful.

(*Id.*) In a short letter dated October 4, 2007, the Board reaffirmed Shaywitz's examination results.

Shaywitz filed the instant litigation on May 6, 2009. In his Complaint, he claims that the Board discriminated against him by refusing to provide reasonable accommodation for his disability—dyslexia, arrhythmias, and anxiety—as required under the ADA. He seeks a permanent injunction ordering the Board to certify him or "all other and further relief as may be appropriate." (Compl. at 16.)

## II. DISCUSSION

### A. STANDARD OF REVIEW

In connection with a Rule 56 motion, "[s]ummary judgment is proper if, viewing all facts of record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

The moving party bears the burden of proving that no genuine issue of material fact exists, or that due to the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir.1994). The opposing party cannot defeat summary judgment by relying on the allegations in the complaint, conclusory statements, or mere assertions that affidavits supporting the motion are not credible. *See Gottlieb v. Cnty. of Orange,* 84 F.3d 511, 518 (2d Cir.1996).

### B. THE AMERICANS WITH DISABILITIES ACT[3]

Title III of the ADA prohibits discrimination against disabled individuals "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation ...." 42 U.S.C. § 12182(a). "A Title III claim therefore requires that a plaintiff establish that (1) he or she is disabled within the meaning of the ADA;" (2) that the defendant is sub-

**3.** The Board argues that Shaywitz waived his right to sue under the ADA by signing a release as part of the Application for Certification. Because the issue of notice is dispositive, the Court need not address the parties' waiver arguments.

ject to the ADA; and "(3) that the defendants discriminated against the plaintiff within the meaning of the ADA." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 368 (2d Cir.2008). Discrimination under Title III includes "a failure to make reasonable modifications in policies, practices, or procedures ... unless the entity can demonstrate that making such modifications would fundamentally alter the nature of [its] ... services...." 42 U.S.C. § 12182(b)(2)(A)(ii). Thus, under the ADA, a "defendant is not required to offer an accommodation that imposes an undue hardship on its program's operation; it is only required to make a reasonable accommodation." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88 (2d Cir.2004).

Section 309 of Title III specifically applies to entities "that offer[ ] examinations or courses related to applications, licensing, certification, or credentialing ...." 42 U.S.C. § 12189. The United States Justice Department's implementing regulation for that provision provides that an ADA-covered examination should be administered so as to "best ensure" that its results reflect "the individual's aptitude or achievement level or whatever other factor the examination purports to measure," rather than reflecting the individual's disability. 28 C.F.R. § 36.309(b)(1)(i). A private entity offering such an examination must provide "appropriate auxiliary aids" for those with disabilities, 28 C.F.R. § 36.309(b)(3), such as additional time or an alteration in "the manner in which the examination is given," 28 C.F.R. § 36.309(b)(2), unless the modification would "fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden." 28 C.F.R. § 36.309(b)(3); *see also Powell*, 364 F.3d at 88.

The Board does not dispute that it is subject to the requirements of Section 309 of the ADA. Furthermore, while the Board does challenge the qualification of Shaywitz as "disabled" under the ADA, it addresses the issue only in a footnote. On that point, the Court finds that the Board has failed to meet its Rule 56 burden regarding Shaywitz's status as disabled.

Thus, the Court must address only the remaining element—whether the Board discriminated against Shaywitz within the meaning of the ADA. The Board argues that Shaywitz did not provide adequate notice of his need for accommodations and that, regardless, his requested accommodations are not "reasonable" under the ADA.

## C. *NOTICE UNDER THE ADA*

Although courts in the Second Circuit do not always explicitly list notice of the alleged disability as an element of a Title III failure to accommodate claim, it is an assumed prerequisite. *See Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 86 (2d Cir.2000) (remanding to district court with instructions to "consider ... whether the Board had enough information to determine that [plaintiff] was disabled.... If [the plaintiff's] requests for accommodations did not provide enough information for the Board to determine that she was disabled, the Board would not be liable"); *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir.2009) (in employment discrimination case, listing notice as required element of failure to accommodate claim); *Falchenberg v. N.Y. State Dep't of Educ.*, 642 F.Supp.2d 156, 162 (S.D.N.Y.2008) (listing notice as an element of prima facie Title III case); *Hartnett v. Fielding Graduate Inst.*, 400 F.Supp.2d 570, 576 (S.D.N.Y.2005), *aff'd in part and rev'd in part*, 198 Fed.Appx. 89 (2d Cir.2006) (same).

■ Reason dictates that in order for a defendant to be liable for discrimination "on the basis of disability," 42 U.S.C. § 12182(a), the defendant must have had adequate knowledge of the plaintiff's disability. After all, "a[ ] [defendant] can be expected to respond only to what it knows (or is chargeable with knowing)." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795 (1st Cir.1992).[4] In line with this observation, the Justice Department's regulations implementing Section 309 assume that an examinee would *request* accommodations, thereby putting the entity on notice, and that the entity offering the exam should then consider the request in reaching a determination. For example, the regulations provide that "[w]hen considering requests for ... accommodations," the testing entity must weigh documentation of past accommodations, 28 C.F.R. § 36.309(b)(1)(v). In addition, any request for documentation must be "reasonable and limited to the need for modification, accommodation, auxiliary aid or service requested." 28 C.F.R. § 36.309(b)(1)(iv).

Indeed, Title III's requirement that private entities make "reasonable accommodations" for disabled individuals would be rendered meaningless if the entity had no basis for knowing (1) what accommodations the examinee was seeking, and (2) whether those accommodations were reasonable in light of the disability and the test. *See Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 309 (1st Cir.2003) ("The operative provision, 42 U.S.C. § 12182(b)(2)(A)(ii), requires a person with a disability to request a reasonable and necessary modification, thereby informing the operator of a public accommodation about the disability.").

■ The record in this case conclusively demonstrates that, for Part II of the exam, Shaywitz did not put the Board on notice of his disability by requesting accommodations. Shaywitz registered for the Part II examination three times (and was rescheduled once). Each time, he failed to check the box on the billing statement that would have alerted the Board to his need for accommodations. Nor did he submit to the Board documentation substantiating any of his disabilities or explaining what accommodations he needed for the Part II examination. His written communications to the Board, including the three appeal letters, contain no specific or general requests for accommodation. His March 26, 2007 letter to the Board did mention a "cardiac condition" and a "physical disability," and his final appeal mentioned his cardiac condition and "extreme anxiety." (Def. 56.1 Statement ex. 29, 31.) But Shaywitz failed to substantiate those assertions with any documentation, as the Board requested in accordance with its explicit policies, "regardless of previous requests and/or granted accommodations." (*Id.* ex. 4.) And although Shaywitz had requested and received accommodations for his dyslexia on Part I of the examination, he ignored or overlooked Board policy regarding accommodations for Part II. Although it could be argued that the Board was on notice that Shaywitz was dyslexic following his Part I request, it does not necessarily follow that a candidate who required certain accommodations on the written Part I exam would need the same, or any, accommodations for the live-patient portion of the Part II exam.

Shaywitz rests his claim alleging failure to accommodate on the September 2007 Letter written by his counsel after Shay-

4. The plaintiff in *Wynne* sued under the Rehabilitation Act. The Second Circuit applies the same standard to the Rehabilitation Act and Title III of the ADA. *See Powell*, 364 F.3d at 85.

witz had failed his third Part II examination.[5] However, that letter is deficient in two respects. First, while it explicitly discusses Shaywitz's dyslexia, cardiac arrhythmias and anxiety, it does not provide any documentation regarding those conditions, nor does it contain an identifiable request for accommodation. Instead, the letter threatens litigation and ends essentially with a legal conclusion that "there is no rational reason to deny Board certification to Dr. Shaywitz." (*Id.* ex. 34.) Second, even if the letter did include an identifiable request for accommodation, it arrived well after Shaywitz had failed Part II for a third time. Under its explicit, general policies, the Board was not in a position at that time to offer Shaywitz accommodations on the Part II exam because his Part I passing score had expired.

Shaywitz attempts to analogize his case to that of the plaintiff in *Singh v. George Washington Univ. Sch. of Med. & Health Sciences*, 508 F.3d 1097 (D.C.Cir.2007), in which the plaintiff alleged that the defendant discriminated against her by refusing to accommodate her dyslexia and dismissing her from medical school. The plaintiff, who had received several failing grades, communicated her diagnosis and a request for accommodations to the dean of the school, who dismissed her "shortly thereafter." *Id.* at 1099. The D.C. Circuit rejected the defendant's argument that the request for accommodation was untimely; the plaintiff had made her request *before* her dismissal, "when the University was in a position to respond." *Id.* at 1105. The Court explicitly declined to address the case of a plaintiff who, "once ousted on terms applicable to a non-disabled person, knocks on the door anew to seek reinstatement under the ADA." *Id.*

In contrast to the plaintiff in *Singh,* Shaywitz did not make a request for accommodation when the Board was in a position to respond; rather, his case is that of the plaintiff ousted on terms applicable to a non-disabled person, seeking an ex post exemption from the general rule. The facts are more aptly compared to those in *Ferrell v. Howard University,* No. Civ. A.98–1009, 1999 WL 1581759 (D.D.C. Dec. 2, 1999). In *Ferrell,* the plaintiff medical student failed a licensing examination three times and was then dismissed in accordance with Howard University's general policies. After her dismissal, she was diagnosed with Attention–Deficit–Hyperactivity Disorder, and only subsequently requested accommodation. In granting summary judgment for the defendant, the court held that "the ADA prohibit[s] only discriminatory acts performed with an awareness of the disability itself and not merely an awareness of some deficiency in the plaintiff's performance that might be a product of an unknown disability." *Id.* at *5 (internal quotation marks omitted). Dispensing with a notice requirement would result in "perverse consequences ... such as plaintiffs securing post hoc diagnoses that encompass the conduct that led to the challenged action." *Id.* (internal quotation marks omitted), Finally, the court concluded that the ADA does not

---

5. Shaywitz also argues that the Court has "already held" in its Decision and Order dated December 17, 2010 that Shaywitz made a request for accommodation as required under Title III of the ADA. (Docket No. 58 at 13.) The Court cannot locate any such holding. Regardless, any statements in the Court's December 17, 2010 Decision and Order regarding requests for Board certification were made only for the limited purpose of ruling on a motion to dismiss, and did not reflect a finding of fact or conclusion of law. *See Shaywitz,* 675 F.Supp.2d at 379 n. 1 ("The Court accepts these facts as true for the purposes of ruling on a motion to dismiss.").

require that the defendant create a "post hoc exception" to its explicit policies. *Id.*

Regardless of whether Part II of the Board's examination is a good test, or even a fair test, the fact is that Shaywitz did not follow the Board's policies regarding accommodations for Part II, and, as a result, did not communicate to the Board a request for accommodation, In reaching this conclusion, the Court does not go as far as to endorse or find legal justification for every minute requirement of the Board's policies on disability accommodation. Rather, Shaywitz simply did not give the Board "the time or the information necessary to make a reasoned judgment with respect to the alleged disability." *Varad v. Barshak,* 261 F.Supp.2d 47, 55 (D.Mass. 2003) (granting summary judgment for defendant where plaintiff failed to follow policy regarding request for accommodation on bar exam). Plainly, the Board's policies were not so burdensome that Shaywitz was unable to comply with them, since he did for Part I. And while the ADA would not require Shaywitz to "engage in a futile gesture" if he knew that the Board does not intend to comply with the ADA, such is not the case here. 42 U.S.C. § 12188(a)(1). The Board has not indicated any unwillingness to accommodate Shaywitz—far from it. The Board granted Shaywitz all his requested accommodations on Part I. And subsequent to the filing of this suit, the Board offered to grant an exception to its policy and allow Shaywitz to re-take Part II with double time or over a two-day period.[6] (Docket No. 62, ex. C.) Shaywitz rejected this proposal.

In sum, the Court can find no evidence in the record that Shaywitz notified the Board of his disability or requested accommodation on Part II. Thus, the Court concludes that no rational jury could find that the Board discriminated against Shaywitz.

### III. *CONCLUSION*

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that the motion (Docket No. 48) of defendant American Board of Psychiatry and Neurology for summary judgment is **GRANTED**.

The Clerk of the Court is directed to terminate any pending motions and to close this case.

**SO ORDERED.**

---

6. In the Board's answer to Shaywitz's Interrogatory No. 19, the Board stated that it had also offered Shaywitz several other accommodations in response to the threat of lawsuit and after the lawsuit was filed, including three opportunities to re-take Part II with triple-time or unlimited time, and the opportunity to take the new Board certification examination before it is made available to other candidates, with Board-selected examiners for the clinical skills evaluations. (*See* Bowman Decl. ex. 5.)